[Cite as *Aubry v. Univ. of Toledo Med. Ctr.*, 2011-Ohio-1401.]

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

LAWRENCE AUBRY, et al.

      Plaintiffs

      v.

THE UNIVERSITY OF TOLEDO MEDICAL CENTER f/k/a MEDICAL UNIVERSITY OF OHIO AT TOLEDO

      Defendant
      Case No. 2007-05814

Judge Clark B. Weaver Sr.
Magistrate Lewis F. Pettigrew

<u>MAGISTRATE DECISION</u>

{¶ 1} Plaintiff, Lawrence Aubry,[1] brought this action against defendant, The University of Toledo Medical Center (UTMC), alleging medical malpractice. Plaintiff's wife asserted a claim for loss of consortium. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability. On July 21, 2010, the court issued a decision in favor of plaintiff and the case proceeded to trial on the issue of damages.[2]

{¶ 2} At the liability trial, plaintiff testified that he has experienced difficulty with urination since the 1980s and that he has undergone several urological procedures in an effort to relieve his symptoms, which include urinary frequency and difficulty emptying his bladder. Plaintiff had a transurethral resection of the prostate gland (TURP), performed in 1987, and again in 1989, with some improvement in his condition.

---

[1]Throughout this decision, "plaintiff" shall refer to Lawrence Aubry.

[2]Plaintiffs' January 12, 2011 motion to exceed the page limitation for their post-trial brief is GRANTED instanter.

In the 1990s, plaintiff's condition worsened and he sought treatment from G. Mark Seal, M.D., at UTMC. Initially, plaintiff took medication in an effort to shrink the prostate gland which helped to alleviate his symptoms temporarily. In 2005, plaintiff again complained to Dr. Seal that he was awakened several times during the night to urinate and that he experienced frequency and urgency along with the feeling that his bladder was not being emptied. Plaintiff testified that Dr. Seal suggested in 2006 that plaintiff undergo a "green-light" laser procedure to eliminate excess prostatic tissue.

{¶ 3} The surgery was performed at UTMC on June 19, 2006, and according to plaintiff, he experienced significant pain postoperatively, along with bleeding and urinary incontinence. Plaintiff testified that within a very short period of time after the laser procedure was performed, he became totally incontinent of urine, soaking through numerous adult disposable pads per day.

{¶ 4} Plaintiffs alleged that UTMC was liable to them, under the theory of respondeat superior, for the negligence of UTMC employee, Dr. Miocinovic. The court concluded that Dr. Miocinovic deviated from the standard of care in performing the green-light laser procedure, and that Dr. Miocinovic's negligence was a proximate cause of plaintiff's complete urinary incontinence. Judgment was entered in favor of plaintiffs in an amount to be determined following a trial on the issue of damages.

{¶ 5} On September 3, 2010, the court issued an amended judgment entry, pursuant to R.C. 2307.23, apportioning liability for plaintiff's injury equally between Drs. Miocinovic and Seal.

{¶ 6} At the damages trial, plaintiff presented the testimony of his treating neurologist Dr. Murtaugh. Dr. Murtaugh has been a practicing urologist for the past 30 years; he is board-certified in urology and licensed to practice medicine in Ohio. On August 21, 2006, Dr. Murtaugh saw plaintiff relative to his complaints of urinary incontinence. Upon examination, Dr. Murtaugh found that plaintiff was suffering from symptoms associated with an "incompetent external urethra"; that his internal sphincter

was "patent"; and that plaintiff reported using up to 20 adult diapers per day. Dr. Murtaugh recommended a surgical procedure whereby an artificial sphincter would be implanted in place of plaintiff's natural sphincter. Dr. Murtaugh discussed with plaintiff both the risks and benefits of the artificial sphincter, he explained the procedure for implanting the device, and he detailed the steps plaintiff would be required to take in order to properly use the device. Plaintiff eventually consented to the procedure after seeking two additional opinions.

{¶ 7} According to Dr. Murtaugh, the artificial sphincter consists of three basic components: a cuff; a pump; and a balloon. In this instance, Dr. Murtaugh elected to use two cuffs instead of one. He explained that an incision is made along the patient's perineum and that the device is implanted inside the patient. The cylindrical cuff, or in this case cuffs, are placed over the urethra and either inflated to crimp the urethra and stop the flow of urine from the bladder or deflated in order to allow urine to flow. The balloon, which is implanted near the patient's bladder, holds a natural reservoir of water which is used to inflate the cuffs. The pump, which is implanted in the patient's scrotum, is activated when the patient manually depresses a button and deactivated when the patient depresses a second button. When activated, the pump forces water from the reservoir into the cuffs which inflate and crimp the urethra. According to Dr. Murtaugh, once the device is surgically implanted, it may be activated only after it has "seeded" in the patient's body, a process which takes approximately six weeks.

{¶ 8} Plaintiff testified that following the surgery he experienced excruciating pain in his perineum and scrotum, and that the pain was so severe that it was not adequately relieved by medication. According to plaintiff, the post-operative pain was the worst pain he had ever experienced. In fact, both plaintiff and his wife testified that he was reduced to lying on his back on the floor of his home in order to achieve some relief.

{¶ 9} Plaintiff was also totally incontinent of urine after the surgery, which complicated the healing process. In fact, plaintiff suffered an excoriated perineum

shortly after the surgery due to severe diaper rash. Dr. Murtaugh attributed this complication to the fact that plaintiff's perineum was frequently in contact with urine-soaked pads. At that time, plaintiff reported to Dr. Murtaugh that he was soaking through roughly 20 adult diapers per day. Two weeks after the surgery, which took place on November 13, 2006, plaintiff reported that his continued urinary incontinence made it impossible for him to keep his incision dry, and that the area was extremely sore and chafed. Fearing infection, Dr. Murtaugh prescribed a Cunningham clamp which he described as a plastic clip with a rubberized inner surface that is placed over the penis in order to crimp the urethra and stop the unwanted flow of urine. Plaintiff was to use this device for the next six weeks until the artificial sphincter was properly "seeded" and could be activated.

{¶ 10} On November 30, 2006, plaintiff presented to Dr. Murtaugh with a scrotal erythema secondary to a severe fungal infection. According to plaintiff, the infection was extremely painful and caused his scrotum to swell to the size of a grapefruit. Dr. Murtaugh prescribed a topical medication and plaintiff stated that the condition eventually resolved.

{¶ 11} Finally, on January 27, 2007, the artificial sphincter was activated. Plaintiff, however, developed problems with his use of the device almost immediately. According to Dr. Murtaugh, plaintiff lacked the manual dexterity to switch the device either to the "off" or "on" position at the appropriate time. For instance, plaintiff was instructed to turn the device off at bed-time both to prevent leakage, reduce wear and tear on his urethra, and to extend the useful life of the device. According to Dr. Murtaugh, when the device is in the "on" position, the bladder contracts as if to expel urine into the urethra. Unless it is deactivated, the device causes the bladder to remain in a contracted position which will prevent it from storing any urine from the kidneys. Instead, the urine is expelled immediately into the urethra and leaks out. Plaintiff

acknowledged that he has had difficulty manipulating the device and that he is often unsuccessful when he attempts to turn the device to the off position at bed time.

**{¶ 12}** Dr. Murtaugh saw plaintiff again on April 17, 2007, and it was reported that the artificial sphincter was working well. Plaintiff was instructed to return in one year.

**{¶ 13}** Dr. Murtaugh's treatment notes reveal that upon plaintiff's return on May 23, 2008, plaintiff reported that he was having trouble manipulating the device, but that he was "pretty pleased" with it. The notes state that plaintiff reported that the artificial sphincter had "changed his life." At trial, plaintiff disagreed with the statements attributed to him in the notes.

**{¶ 14}** Approximately one year later, plaintiff reported to Dr. Murtaugh that he was experiencing a burning sensation upon urination with a pinkish discharge. Dr. Murtaugh suspected bleeding either from an infection or the erosion of the urethra. An exploratory procedure was conducted in June 2009, but no sign of infection or erosion was observed. Dr. Murtaugh recommended certain behavior modifications such as restricting liquids to the volume needed for basic hydration, eliminating diuretics such as caffeine, and abstaining from liquids after 6:00 p.m.

**{¶ 15}** Plaintiff was seen by Dr. Murtaugh most recently on August 13, 2010. At that visit, plaintiff related that the device had been working well until recently, but that he was now experiencing leakage which has caused him to resume the frequent use of adult diapers. Testing revealed that the artificial sphincter was still in working order but that plaintiff was having bladder spasms. Dr. Murtaugh again suggested behavioral modification and he recommended that plaintiff deactivate the device at night as a means to relieve the spasms. Dr. Murtaugh described plaintiff as a compliant patient but he believed that plaintiff's ongoing problems with the artificial sphincter were a result of his lack of dexterity, his age, and his frustration and depression over having to use such a device on a daily basis. Dr. Murtaugh also believed that plaintiff suffers from an overactive bladder which exacerbates the problems he is having with leakage.

{¶ 16} Plaintiff's wife testified convincingly regarding the loss of enjoyment that she has experienced as a result of plaintiff's urinary problems. She related that the couple had been avid sailors and that they often had accepted invitations from other couples to sail on their boats. However, after the unsuccessful surgical procedure that caused plaintiff's urinary incontinence, they were unwilling to either extend or accept any such invitations due to plaintiff's need to wear and then dispose of adult diapers.

{¶ 17} According to plaintiffs, they still sail their own boat at times but they have not sailed with others for a very long time. Plaintiff's wife appeared visibly frustrated by the circumstances of their daily lives and she testified credibly that the happy and fruitful retirement that she and plaintiff had envisioned has been ruined by plaintiff's urinary difficulties. The strain has also affected the quality of the marriage. The couple does not socialize with others as they would like and they have had no sexual intimacy since the surgical procedure which rendered plaintiff incontinent of urine. Plaintiff explained that he can play only nine holes at a time due to his fear of wetting himself, and that trips away from home are limited by the difficulty associated with the sanitary disposal of wet adult diapers.

{¶ 18} Plaintiff appears quite distraught over his current situation and his inability to enjoy his retirement, and he believes that his situation will not improve. He is also quite aware of his wife's disappointment with current circumstances of their marriage and he experiences feelings of guilt.

{¶ 19} As far as plaintiff's medical prognosis is concerned, Dr. Murtaugh testified that the useful life of the artificial sphincter is dictated not by the device itself but by the durability of plaintiff's urethra. According to Dr. Murtaugh, the cuffs slowly erode the urethra in the immediate area of the implant and at some point they must be removed, replaced and re-seeded elsewhere on the urethra.

{¶ 20} Dr. Murtaugh acknowledged that it is difficult to predict when an implant will need to be replaced, and that there is simply not enough available data upon which

to base an opinion. In this case, where two cuffs have been seeded, Dr. Murtaugh could not predict when a second procedure would be required. He did opine, however, over defendant's objection, that plaintiff would need a second implant procedure in his lifetime.

{¶ 21} The evidence establishes that the total costs of the original implant procedure were $45,047 and that plaintiff's associated medical expenses to date are $12,619. All of plaintiff's medical expenses have been paid. The evidence establishes that a second procedure would entail roughly the same expenditures as the first.

{¶ 22} When asked whether he would be willing to undergo a second implant should the present one fail, plaintiff was undecided. He was simply unable to say for sure whether he could endure the post-operative pain he experienced with the first implant procedure. Plaintiff was 74 years of age at the time of the damages trial and his life expectancy is another 12.2 years.[3] Both plaintiff and his wife are retired.

{¶ 23} Based upon the foregoing, the court finds that plaintiff will, more likely than not, require a second implant procedure in his lifetime and that, more likely than not, he will elect to undergo such a procedure. Accordingly, the costs associated with a second procedure will be included in plaintiffs' award.

{¶ 24} Plaintiff has acknowledged that he experienced urinary tract issues prior to the surgery and the evidence shows that those issues had adversely affected both his social life and his ability to perform sexually. According to plaintiff, though, such issues were very minor when compared to his current difficulties and the evidence supports plaintiff's testimony. Similarly, Dr. Murtaugh believed that the problems plaintiff currently experiences with leakage are attributable to plaintiff's difficulty in manipulating the device rather than either a failure of the device or erosion of the urethra.

---

[3]Defendant challenged the competency of Ann Koerner, plaintiff's "special needs consultant" to opine as to plaintiff's life expectancy. Koerner's opinion was based upon tables published by the Department of Labor, and there is no argument that such tables are a generally accepted method of determining life expectancy. A copy of the relevant table was submitted to the court as Plaintiffs' Exhibit 13 and the same is hereby admitted into evidence. Defendant's objection is OVERRULED.

Nevertheless, as a general rule of damages in tort, "a defendant who negligently inflicts injury on another takes the injured party as he finds him, which means it is not a defense that some other person of greater strength, constitution, or emotional makeup might have been less injured, or differently injured, or quicker to recover." See *Fleckner v. Fleckner*, 177 Ohio App.3d 706, 2008-Ohio-4000.

**{¶ 25}** Based upon the foregoing, the court finds that compensatory damages for plaintiff's past and future pain and suffering are $250,000, and for plaintiff's past and future loss of enjoyment of life, $150,000. Plaintiff's wife, Joyce Aubry, shall be awarded the sum of $150,000 for the loss of consortium.

**{¶ 26}** Although plaintiffs produced evidence of past medical expenses of more than $61,000, the evidence demonstrates that only a small fraction of that amount represents uncompensated medical expenses, and that the bulk of these expenses were covered either by Medicare or medical insurance. With regard to future medical expenses, the evidence supports a finding that such expenses will be $75,000. Plaintiffs argue that new Medicare guidelines will require them to reimburse Medicare for some of these future medical expenses out of the proceeds of this case, and plaintiffs proffered evidence as to the estimated sum that must be set aside for that purpose.

**{¶ 27}** However, even if the court were to include all past and future medical expenses in plaintiffs' award, whether compensated or uncompensated, plaintiffs' gross compensatory damages are $675,000. After consideration of mandatory statutory set-offs and deductions, as discussed below, plaintiffs' net award will still be $0.

**{¶ 28}** Indeed, pursuant to R.C. 3345.40, damages for non-economic loss available to plaintiffs in an action in tort against a state university are capped at $250,000 for any person. See R.C. 3345.40(B)(3). Thus, plaintiffs' award of $350,000 for non-economic loss, must be reduced to $250,000. No reduction in the award to

plaintiff's wife is required.  Plaintiffs' award must be further reduced by 50 percent, as required by R.C. 2307.23, in order to account for the negligence attributable to Dr. Seal.

{¶ 29} Finally, on December 10, 2010, the parties stipulated that plaintiffs received the sum of $295,000 in settlement of their claim against Dr. Seal.  Defendant maintains that plaintiffs' award of damages must be set off by the collateral recovery plaintiffs received from Dr. Seal.[4]  Plaintiffs argue that R.C. 3345.40(B) does not require such a reduction.  In seeking partial summary judgment on that issue, plaintiffs relied, alternatively, upon the more restrictive definition of "benefits" contained in R.C. 2744.05, which applies to political subdivisions, and upon the liability provisions contained in R.C. 2307.22, which limits a  joint tortfeasor's liability to the *proportionate share of compensatory damages that represent non-economic loss*.

{¶ 30} In the court's November 10, 2010 decision, the court relied upon the following language of R.C. 3345.40(B) in denying plaintiffs' motion:  "[*n*]*otwithstanding any other provision of the Revised Code or rules of a court to the contrary* the amount of benefits received by plaintiffs from any source shall be deducted from any award against a state university in favor of plaintiffs. (Emphasis added.)  See also *Mitchel v. Borton* (1990), 70 Ohio App.3d 141."

{¶ 31} For the reasons set forth in the court's prior decision in this case, the court concludes that neither R.C. 2744.05 nor 2307.02 has any impact upon the issue of set-off as it relates to claims against a state university such as UTMC.  Accordingly, pursuant to R.C. 3345.40, plaintiffs' award of damages against defendant shall be reduced by the $295,000 received from Dr. Seal, which results in a net monetary award of $0.

{¶ 32} The court appreciates plaintiffs' frustration and disappointment in having their award of compensatory damages reduced to $0 due entirely to the fact that one of

---

[4]R.C. 3345.40(B)(2) provides in relevant part:  "If a plaintiff receives * * * benefits for injuries or loss allegedly incurred from a policy or policies of insurance or any other source, the benefits shall be

the joint tortfeasors is a state university. However, the discretion to alter or amend the relevant statutes resides with the Ohio General Assembly, not the court. Judgment is recommended in favor of plaintiffs in the amount of $25, representing plaintiffs' filing fee.

*A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law*

*under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*


_____

LEWIS F. PETTIGREW
Magistrate

cc:

Anne B. Strait                      Thomas W. Gallagher
Brian M. Kneafsey, Jr.            400 Toledo Legal Building
Assistant Attorneys General       416 North Erie Street
150 East Gay Street, 18th Floor     Toledo, Ohio 43604-5622
Columbus, Ohio 43215-3130

LP/cmd
Filed February 10, 2011
To S.C. reporter March 22, 2011

---

disclosed to the court, and the amount of the benefits shall be deducted from any award against the state university or college recovered by the plaintiff."